**David SZUMIGALA and Brenda Szumigala, Individually, and as Administratrix of the Estate of Michael Szumigala, Deceased, Plaintiffs–Appellees Cross–Appellants,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant–Appellant Cross–Appellee.**

No. 88–4063

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

July 26, 1988.

James N. Compton, Peter C. Abide, Biloxi, Miss., for defendant-appellant cross-appellee.

Lyle M. Page, Fred Mannino, Ronald S. Cochran, Biloxi, Miss., for plaintiffs-appellees cross-appellants.

Before GEE, RUBIN, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Appellees David and Brenda Szumigala brought this Mississippi diversity action alleging that appellant Nationwide Mutual Insurance Company ("Nationwide") had refused in bad faith to pay insurance claims for combined, or "stacked," [1] medical payment coverages and for uninsured motorist benefits. The Szumigalas sued on two Nationwide auto policies: one policy covering three vehicles and the other policy covering a single, fourth vehicle. Because we inter-

pret the "limits of liability" clause contained in the multi-vehicle policy to preclude stacking of medical payment coverages thereunder, we reverse the judgment of the district court permitting such stacking and remand with instructions to deduct the amount improperly aggregated—$2,000—from the final award. On cross-appeal, we affirm in part and reverse in part and remand the district court's partial summary judgment holding that Nationwide's refusal to pay benefits had been arguably legitimate under the facts of this case and that no claim for punitive damages should have been submitted to the jury.

## I. Background

On July 22, 1985, the Szumigalas' decedent, Michael Szumigala, was killed when an uninsured motorcyclist broadsided the bicycle he was riding. The accident occurred near Starkville, Mississippi, at the intersection of Blackjack and Morrill Roads. The motorcyclist, John Cambre, approached the intersection from the east along Blackjack Road, traveling near, yet within, the speed limit of 45 miles per hour. Michael Szumigala approached from the north along Morrill Road. Disregarding the stop sign giving Cambre the right-of-way, Michael attempted a left turn onto Blackjack Road directly into the path of the oncoming motorcycle. According to the county deputy sheriff who arrived at the scene some twenty minutes after the accident, there was no time for Cambre to take any evasive action.

When found in a ditch on the south side of Blackjack Road, Michael Szumigala was already dead and Cambre was in a coma; upon recovery, Cambre would remember nothing about events immediately preceding the impact. Three other persons were in close proximity to the accident, but none actually witnessed it. When it occurred, Harold and Rosemary Thompson were traveling in their car on Morrill Road,

---

1. "Stacking" here refers to recovery of medical payment coverages on more than one vehicle, where the amount available under a single coverage is insufficient to satisfy the damages alleged. The stacking may be of coverages on more than one vehicle provided either under a single policy, or under different policies, or both. By stacking, the injured party may aggregate the amounts of coverage up to the amount of damage sustained. *See Government Employees Ins. Co. v. Brown*, 446 So.2d 1002, 1004 (Miss.1984).

about 300 to 400 feet behind the bicycle rider. Mr. Thompson observed the motorcycle approach to within 150 feet of the intersection and then saw Michael Szumigala begin executing his fateful left turn onto Blackjack Road. As the riders passed from view behind a copse of trees lining Blackjack Road, Mr. Thompson remarked to his wife that a collision was imminent. Mrs. Thompson heard the remark and looked up in time to catch a glimpse of a blue vehicle; however, she did not see the motorcycle, the bicycle, or the collision. Likewise, a nearby resident, Mrs. Elizabeth Gray, saw only the post-impact scene of an airborne body and what she later described as "the top of a car" parallel to the body.

The deputy sheriff who investigated the accident issued a report that would later figure prominently in Nationwide's own investigation and its decision to deny uninsured motorist benefits. Based on the physical evidence at the scene and statements taken from the above-named witnesses, the deputy concluded that the bicyclist's failure to yield the right-of-way caused the accident and that there was no evidence of improper driving by the motorcyclist.

At the time of the accident, Michael Szumigala's father, appellee David Szumigala, was the named insured under two Century Auto Policies issued by Nationwide. One of the policies (the "multi-vehicle policy") provided coverage for three vehicles owned by the Szumigalas; the other policy (the "single-vehicle policy") provided coverage for only a fourth vehicle. In addition to the standard collision and liability coverages, which are not relevant to this appeal, both policies contained endorsements providing medical payment and uninsured motorist coverages.

Under the endorsement for uninsured motorist coverage, Nationwide agreed to pay the insured all sums which the insured or members of his household would be *legally entitled* to recover as personal injury damages arising out of the tortious act or omission of an uninsured motorist. Implied in this term is the notion that recovery cannot be had where the injury was caused by a non-negligent uninsured motorist. Under the policies purchased by the Szumigalas, Nationwide's liability for uninsured motorist coverage was limited to $10,000 per vehicle listed in the policy declarations, and separate premiums were paid for such coverage on each of the four vehicles insured.

Under a separate endorsement for medical payment coverage, Nationwide agreed to pay the insured all reasonable expenses for, *inter alia*, funeral services for residents of the insured's household. Events triggering medical payments under the policy included bodily injury or death (1) "while in or upon, entering or alighting from" an insured vehicle; and (2) as a result of "being struck" by a motor vehicle as a pedestrian or while riding on any device other than a land motor vehicle.

It is undisputed that under the policy's second triggering provision, Nationwide became obligated to pay medical payment benefits. The issue raised here is the extent of that obligation. Under both policies purchased by the Szumigalas, medical payment coverage was provided in the amount of $1,000 for each automobile listed in the policy declarations. A "limits of liability" provision set out in the medical payment endorsement read as follows:

> The amount payable under this endorsement to or for the benefit of any one person and arising out of any one accident shall not exceed the limit of liability set forth in the Century Policy Declarations. The affording of insurance to more than one person *or to more than one automobile* or land motor vehicle hereunder shall not operate to increase the limits of the Company's liability. [Emphasis added.]

Upon notification of the accident, Nationwide initiated an investigation through Crawford & Company ("Crawford"), an independent insurance adjuster retained because of its familiarity with the Starkville area, where Nationwide had no field claims office. Within two weeks after the accident, Nationwide advised the Szumigalas that an investigation was in progress and

that uninsured motorist coverage might be applicable.

On August 15, 1985, Crawford submitted a preliminary evaluation, including photographs and the deputy's report, and indicated to Nationwide that "[b]ased on the information we have at this time, it would appear that liability would be probable on the part of the insured driver. It would appear that the insured driver simply pulled out in front of the adverse party vehicle." Crawford then conducted further investigation, interviewing two of the three witnesses, as well as Cambre.[2] A supplementary report was issued on September 16, 1985, stating that the witnesses' recollections had been "very hazy" and that Cambre, though remembering nothing about the accident, was indeed an uninsured motorist. Crawford concluded by reaffirming its earlier evaluation that attributed fault entirely to the decedent.

On October 23, 1985, the Szumigalas' attorney demanded that Nationwide pay uninsured motorist benefits on the ground that Cambre had been negligent in causing the accident. Nationwide's response on November 5 was that the initial investigation had indicated the decedent to be solely at fault, but that any information the Szumugalas' possessed that might bear on Cambre's negligence would be considered, since the claim was still being evaluated. At that time, Nationwide also tendered $1,000 of medical payment benefits under the multi-vehicle policy, an amount equal to the limits of coverage on only one of the three vehicles insured thereunder. No medical payments under the single-vehicle policy were tendered at that time.

Nationwide formally denied uninsured motorist coverage some two weeks after this action was filed, on November 15, 1985. In their complaint, the Szumugalas sought compensatory damages under both the uninsured motorist and the medical payment endorsements of both policies. The Szumigalas further alleged that Nationwide's denial to pay uninsured motorist benefits without first having conducted a

reasonable investigation gave rise to a tortious breach of the insurance contract and a breach of fiduciary duty, meriting punitive damages. The Szumigalas also sought punitive damages based upon Nationwide's refusal to stack medical payment coverages contrary to their reading of policy terms and Mississippi precedent.

In June 1987, nineteen months after this suit was filed, Nationwide paid the Szumigalas an additional $1,000, representing the limits of the medical payments coverage under the single-vehicle policy. This decision followed an in-house determination by Nationwide officials, contrary to prior advice of counsel, that the relevant policy language did not preclude stacking of medical payments provided under separate policies. Days later, on June 15, 1987, Nationwide moved for partial summary judgment on the issues of the validity of the punitive damage claim for bad faith breach and the claim for stacked medical payments coverage under the multi-vehicle policy. On August 28, 1987, the district court granted Nationwide's motion on the punitive damages issue, concluding that the facts of this case present a "classic jury question" as to whether Cambre was in any way negligent. On the issue of medical payment stacking, the district court interpreted the policy "limits of liability" clause to be ambiguous, which ambiguity was resolved in favor of the insured.

Trial of this case commenced on September 8, 1987. Through the utilization of an accident reconstructionist, Roy Arnold, the Szumigalas were able to create a jury issue. Dr. Arnold admitted there was no evidence that Michael Szumigala stopped at the stop sign on Morrill Road, but opined that the motorcycle should have been able to take evasive action. Arnold also admitted that, with an average reaction time of two seconds, if Cambre was traveling forty miles per hour and had been presented with an obstacle at 120 feet or less, he would have had no realistic opportunity to react. Finally, Arnold found no evidence that an-

2. Crawford took the statements of John Cambre, Rosemary Thompson, and Elizabeth Gray on August 20, 1985. At that time, Harold Thompson refused to give a statement.

other vehicle had been involved in causing the collision.

The jury determined that Michael Szumigala was ninety·percent negligent and that the plaintiffs' damages were $500,000.00. Under Mississippi's comparative negligence law, the verdict was thus reduced to ten percent of the damages, or $50,000.00. This verdict was further reduced to $40,-000.00, which represented the total aggregated uninsured motorist coverages on the two Century Auto Policies.[3]

On appeal, Nationwide challenges the district court's determination to stack medical payments under the multi-vehicle policy, contending that anti-stacking language contained in the policy is neither ambiguous nor proscribed by statute or public policy. The Szumigalas, on cross-appeal, contend that the issue of Nationwide's bad faith in refusing their claims presented a fact issue, precluding summary judgment. We now address each of these contentions in turn.

## II. *Stacking of Medical Payment Benefits under the Multi–Vehicle Policy*

In *State Farm Mutual Auto Ins. Co. v. Scitzs*, 394 So.2d 1371 (Miss.1981), the Mississippi Supreme Court denied stacking of medical payment coverage provided under separate automobile insurance policies issued by the same insurer. Although noting that ambiguities in an insurance contract should be resolved against the insurer, *Scitzs* held that policy language which clearly and unambiguously prohibits stacking of coverages becomes an enforceable part of the bargain. *Id.* at 1372–73; *see also State Farm Mut. Auto. Ins. Co. v. Acosta*, 479 So.2d 1089, 1090–91 (Miss.1985) (following *Scitzs*).

Relying on *Scitzs*, the district court assessed the strength of the limiting language in the Nationwide policy by comparing it to a "limits of liability" clause which the court in *King v. Aetna Cas. & Sur. Co.*, 632 F.Supp. 443 (S.D.Miss.1986), held

to prohibit stacking of medical payment benefits under a multi-vehicle policy. In *King*, the limitation clause provided:

> Regardless of the number of covered autos, ... the most we will pay ... is the limit of Auto Medical Payments shown in the declarations.

*Id.* at 445. In making its comparison, however, the court below quoted as the "relevant part" of the Nationwide policy only the first sentence of the "limits of liability" clause:

> The amount payable under this endorsement to or for the benefit of any one person and arising out of any one accident shall not exceed the limit of liability set forth in the Century Policy Declarations.

From this perspective, the district court decided that Nationwide's clause is not clear and unambiguous, the distinguishing feature being the absence of the qualifying phrase: "regardless of the number of covered autos...."

Whether an ambiguity exists in a contract is a question which we, as a court of review, must decide for ourselves. *Carpenters Amended & Restated Health Benefit Fund v. Holleman Constr. Co.*, 751 F.2d 763, 767 (5th Cir.1985). Although we agree that the first sentence of the Nationwide clause, standing alone, fails clearly to express an intent not to permit stacking of coverages, we believe such intent becomes manifest when the second sentence is also considered. We again quote what we construe to be the decisive qualifying phrase:

> The affording of insurance ... to more than one automobile ... hereunder shall not operate to increase the limits of the Company's liability.

Even straining to do so, we perceive no relevant ambiguity in this language. The policy language very plainly states that the policy limit equals the amount of coverage attributable to a single vehicle, *regardless of the number of covered autos.*[4]

---

**3.** Under Mississippi law, uninsured motorist coverages for which the insured pays separate premiums are stacked, notwithstanding an anti-stacking clause unambiguously to the contrary.

*See Government Employees Ins. Co. v. Brown*, 446 So.2d 1002 (Miss.1984).

**4.** Our construction of this language is consistent with that of at least two state courts of last

The Szumigalas rely on principles developed in *Government Employees Ins. Co. v. Brown*, 446 So.2d 1002 (Miss.1984), a case involving stacking of uninsured motorist coverage. *Brown* held that a strong, if not conclusive, presumption arises any time separate premiums are paid for uninsured motorist coverage on each of several vehicles covered by a single policy, irrespective of limiting language. When premiums are paid in this manner, it is presumed that the parties intended that the insured be allowed to stack the policy's uninsured motorist coverages up to an amount equal to the combined maximum dollar coverage of each vehicle against any actual damages sustained. *Id.* at 1005–06.

The Szumigalas argue that the presumption created in *Brown* is equally applicable here, where the policyholder has paid separate premiums for medical payment coverage on each of several vehicles covered by a single policy. We disagree. In *Brown*, the Mississippi Supreme Court treated the stacking issue as requiring interpretation of legislative intent under the Mississippi uninsured motorist statute, Miss.Code Ann. § 63–15–11 (Supp.1982). *Brown*, 446 So.2d at 1004–05. Because there are no equivalent statutory provisions in Mississippi that affect medical payment coverage contained in automobile insurance policies, we hold that such coverage is governed by the terms of each insurance policy in which it is afforded, including terms of limitation such as Nationwide's anti-stacking clause. *King*, 632 F.Supp. at 444–45; *Tucker v. Aetna Cas. & Sur. Co.*, 609 F.Supp. 1574, 1579–80 (S.D.Miss.1985). That separate premiums are charged for each vehicle does not alone justify stacked recovery of medical payments, since the premium paid on each successive vehicle affords protec-

tion to non-relatives who might be injured while occupying those vehicles.[5]

The Szumigalas also cite *Brown* for its alternative holding that stacking is allowed where the "limits of liability" clause, when read together with the declaration sheet showing separate coverages for multiple vehicles, becomes unclear and ambiguous. *Brown*, 446 So.2d at 1006. The Szumigalas contend that the declaration sheet here, as in *Brown*, seeks to provide separate coverages on three vehicular units and charges separate premiums therefor, while the "limits of liability" clause seeks to repudiate such coverage. Having studied the declaration sheets in both this case and *Brown*,[6] we find the Nationwide sheet distinguishable because it does, in fact, unequivocally incorporate by reference the limitations set out in the policy. In sum, we conclude that the district court erred in stacking medical payments coverages under the multi-vehicle policy.

### III. *Punitive Damages*

■ We now turn to the district court's dismissal, in a summary judgment posture, of the Szumigalas' claim for punitive damages. The Szumigalas contend that the evidence supports the existence of a fact issue regarding Nationwide's bad faith in denying their insurance claims. The Mississippi Supreme Court has determined that such tortious injury occurs "when an insurer's refusal timely to pay a just claim is sufficiently egregious that we label it an independent tort. Where an insurer has acted with malice or with gross negligence and reckless disregard for the rights of the insured, punitive damages may be assessed." *Life Ins. Co. of Mississippi v.*

---

resort. *See, e.g. Lemoi v. Nationwide Mut. Ins. Co.*, 453 A.2d 758 (R.I.1982); *Nationwide Mut. Ins. Co. v. Bair*, 257 S.C. 551, 186 S.E.2d 410 (1972).

5. *See, e.g., Dufour v. Metro. Property & Liab. Ins. Co.*, 438 A.2d 1290, 1293 (Me.1982); *Grimes v. Concord Gen. Mut. Ins. Co.*, 120 N.H. 718, 720–22, 422 A.2d 1312, 1314–15 (1980); *Hampton v. Allstate Ins. Co.*, 126 Ariz. 403, 616 P.2d 78 (1980); *Liddy v. Companion Ins. Co.*, 181 Ind. App. 16, 390 N.E.2d 1022, 1032 (1979).

6. The GEICO declaration sheet made the basis of the decision in *Brown* is attached as Exhibit "A" to the Mississippi Supreme Court's opinion. *See Brown*, 446 So.2d at 1007. The distinguishing language in the Nationwide declaration sheet is located above the list of provided coverages; it states: "COVERAGE *See policy for limits and deductible."

*Allen,* 518 So.2d 1189, 1193 (Miss.1987) (citations omitted).[7]

However, if the evidence suggests that Nationwide had a "reasonably arguable basis" for denying the claim, then its conduct cannot constitute bad faith. *Blue Cross & Blue Shield of Mississippi, Inc. v. Campbell,* 466 So.2d 833, 842 (Miss.1985); *Standard Life Ins. Co. of Indiana v. Veal,* 354 So.2d 239, 248 (Miss.1977). "A claim of bad-faith denial thus 'should not reach the jury unless reasonable minds could differ as to the insurance company having a legitimate or arguable reason for denying the claim.'" *Dueringer v. Gen. Am. Life Ins. Co.,* 842 F.2d 127, 130 (5th Cir.1988) (quoting *Pioneer Life Ins. Co. v. Moss,* 513 So.2d 927, 930 (Miss.1987)).[8] Armed with the above principles, we now set out to determine whether the Szumigalas have brought forward sufficient probative evidence to demonstrate the existence of a triable issue of bad faith.

### A. Bad–Faith Refusal To Pay Uninsured Motorist Benefits

The Szumigalas contend that Nationwide conducted an inadequate investigation of their son's accident and, thus, could not have proceeded from an arguably legitimate basis in denying uninsured motorist coverage. The main thrust of their argument is that Nationwide failed to consider adequately the physical surroundings of the accident site, which investigation would have revealed that the motorcyclist's view of traffic entering the intersection had been unobstructed. From this premise the Szumigalas conclude that the motorcyclist was at least partially at fault for failing to keep a proper lookout (a conclusion in which the jury apparently concurred) and, consequently, that Nationwide had been grossly negligent in evaluating its own liability. In addition, the Szumigalas complain that the investigation was too dilatory (having taken four months) and too reliant on the work of an independent adjuster, and that the interview of a key witness, Mr. Thompson, had not been accomplished.

Although it is well settled under Mississippi law that an insurance company has a duty to investigate promptly and adequately an insured's claim, *see Banker's Life & Cas. Co. v. Crenshaw,* 483 So.2d 254, 276 (Miss.1986), *aff'd on other grounds,* — U.S. —, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), the plaintiff's burden in proving a claim for bad-faith refusal goes beyond merely demonstrating that the investigation was negligent. As we stated in *Merchants Nat'l Bank v. Southeastern Fire Ins. Co.,* 751 F.2d 771, 777 (5th Cir.1985), the level of negligence in conducting the investigation must be such that a proper investigation by the insurer "would easily adduce evidence showing its defenses to be without merit...."

Since uninsured motorist insurance covers personal injuries for which the insured has a legal right of recovery against an uninsured driver, it follows that Nation-

---

**7.** The Szumigalas also would impose strict fiduciary duties on Nationwide as an uninsured motorist carrier. We note that under Mississippi law, however, there is no fiduciary relationship between an insurance company and its insured under a first-party insurance contract. *See, e.g., Harrison v. Benefit Trust Life Ins. Co.,* 656 F.Supp. 304, 305 (N.D.Miss.1987) (citing *Equitable Life Assur. Co. v. Weil,* 103 Miss. 186, 60 So. 133, 134 (1912)); *Gorman v. Southeastern Fidelity Ins. Co.,* 621 F.Supp. 33, 38 (S.D.Miss.), *aff'd on other grounds,* 775 F.2d 655 (5th Cir. 1985). The relationship that does exist is one that is contractual in nature, that of a debtor-creditor type. *Weil, supra;* 2 Couch on Insurance 2d § 23:11. Only when a third party relationship exists between the insurance company and the insured does the insurance company acquire "control" of the litigation that gives rise to a fiduciary relationship. *Harrison. See also* *Craft v. Economy Fire & Cas. Co.,* 572 F.2d 565, 567 (7th Cir.1978); *Baxter v. Royal Indem. Co.,* 285 So.2d 652 (Fla.App.1973); *Walsh v. Campbell,* 130 Ga.App. 194, 220 S.E.2d 657 (1973) (reasoning that one who claims under a first-party policy necessarily takes a position antagonistic to the insurer and must expect to deal with it at arm's length). Since a first-party insurance contract existed between the plaintiff and defendant, we refuse to impose a fiduciary relationship upon the parties.

**8.** Although in Mississippi a judge decides whether the insurance company had a reasonably arguable basis for acting the way it did, federal procedure requires the jury to decide the issue if a material question of fact exists. *Jones v. Benefit Trust Life Ins. Co.,* 800 F.2d 1397, 1400 (5th Cir.1986).

wide's defenses to its contractual obligation to pay uninsured motorist benefits were as meritorious as Cambre's defenses to tort liability. We have reviewed the record and find nothing Nationwide could have uncovered by further investigation that would have undermined at least the arguable merit in Cambre's, and hence its own, defenses.

In deposition, the deputy who personally investigated the accident and who generated the official accident report stated, based upon his interpretation of the physical evidence, that the bicyclist's failure to yield the right-of-way had caused the accident; that Cambre's speed was not a factor because the accident would have occurred even if Cambre had been traveling slower; and that Cambre had had no time to take evasive action. Additionally, because none of the witnesses ultimately was able to testify to any negligence committed by the motorcyclist, no materially significant information could have been obtained by further investigation of these witnesses.

To be sure, the Szumigalas were able to, and did, produce their own expert who could convince the jury that Cambre had been ten percent at fault in causing the accident. Nevertheless, when paucity of fault actually found is coupled with the weight of the evidence contrary to even this minimal finding, we agree with district court's conclusion that Nationwide's liability for payment of uninsured motorist benefits presented "a classic jury question." This being so, we hold that Nationwide's denial of the claim was arguably reasonable and, therefore, not in bad faith. *See Blue Cross & Blue Shield of Mississippi,* 466 So.2d at 843 (stating that unless the insured is entitled to a directed verdict on the contract claim, the insurance carrier will have established, as a matter of law, a reasonably arguable basis to deny the claim "in the vast majority of cases").[9]

### B. Bad–Faith Refusal To Pay Stacked Medical Payment Benefits.

■ Having already established that the "limits of liability" clause contained in the multi-vehicle policy precludes stacking of medical payments coverages thereunder, we quickly turn to the question whether Nationwide's nineteen-month[10] delay in paying medical coverage under the single-vehicle policy raises a jury issue of bad faith. The district court fails to address this question in its order granting partial summary judgment; however, we will assume, based upon the court's disposition of the matter, that the delay was found to be arguably reasonable or legitimate as a matter of law. In support of summary judgment, Nationwide argues that prior to its decision to permit stacking of medical payment coverages in separate policies, it had

9. The *Blue Cross & Blue Shield* test does not always insulate the carrier from punitive damages whenever the issue of compensatory damages reaches the jury. As the Mississippi Supreme Court pointed out, "[u]nder some contrived or specious defense, an insurance carrier may be entitled to have the jury pass on the issue of liability under the contract, yet not thereby insulate itself based upon bad faith." 466 So.2d at 843. In the instant case, no argument is made that Nationwide's defense was contrived or specious.

10. The period of Nationwide's delay in paying medical benefits under the single-vehicle policy has been measured, somewhat tentatively, from mid-November 1985, when Nationwide was served with the Szumigalas' complaint alleging bad-faith failure to stack coverages, until mid-June 1987, when payment under the single-vehicle policy was finally made. Nationwide avers that it only learned of the Szumigalas' demand for stacked medical benefits when suit was filed, as the Szumigalas had failed to institute a claim for stacked coverage with the company's claims department beforehand. In response, the Szumigalas contend that any default they committed in the company's claims procedure resulted from their reliance on misinformation conveyed by a Nationwide claims officer. In any event, we note that shortly before the filing of this action, Nationwide did acknowledge its liability for medical coverage afforded one vehicle covered by the multi-vehicle policy. Because the single-vehicle policy contained an identical coverage scheme, we thus perceive the critical issue to be whether Nationwide had any arguably legitimate basis to refuse, at that time, to acknowledge its parallel liability under the single-vehicle policy. Because the parties are presumed to intend stacking of coverages where a policy is silent, we again focus our analysis on whatever limiting language might be contained in the policy that expresses a contrary intent.

declined to do so under advice of counsel, thereby manifesting its good faith.

We agree that good-faith reliance upon advice of counsel may prevent imposition of punitive damages. *See Henderson v. United States Fidelity & Guar. Co.*, 695 F.2d 109, 113 (5th Cir.1983). But it is simply not enough for the carrier to say it relied on advice of counsel, however unfounded, and then expect that valid claims for coverage can be denied with impunity pursuant to such advice. The advice of counsel is but one factor to be considered in deciding whether the carrier's reason for denying a claim was arguably reasonable. We believe that where, through verbal sleight of hand, the advising attorney concocts an imagined loophole in a policy whose plain language extends coverage, such advice is heeded at the carrier's risk.

Nationwide's purported escape hatch in the instant case is the so-called "other insurance" clause contained in the medical payment endorsement. It states:

> Under ... [this medical payments agreement to pay stated benefits] for being struck by any land motor vehicle or trailer, the insurance shall be excess over any other collectible Automobile Medical Payments Insurance or Family Compensation Insurance against such loss.

According to Nationwide, counsel had advised it that stacking of medical coverage under more than one policy—in this case, under both the multi-vehicle and the single-vehicle policies—was precluded by the operation of the "excess over" language in the above-quoted provision; that is, each policy was believed to become excess coverage over the other. Nationwide contends that when it came to its senses about the validity of this construction, the Szumigalas were promptly paid the benefits of the added coverage.

We believe the difficulties inherent in temporarily denying coverage on this basis creates a jury issue as to whether such denial was arguably reasonable, notwithstanding advice of counsel. As Nationwide read the provision, anytime a second Nationwide auto policy is purchased, the "excess over" language would work to transform the medical payment coverage provided under both the first and second policies into excess coverage. Thus, unless the insured happened to own primary medical coverage through a different carrier whose policy did not contain a similar provision, the effect of purchasing two (or more) Nationwide auto policies would be to leave the policyholder without primary medical benefit coverage at all, an absurd result obviously unintended by the policyholder.[11] Even if we assume this construction to be arguably reasonable, Nationwide's position is made even more tenuous by the fact that medical payments were actually made under the multi-vehicle policy, hence triggering its admitted duty to pay for losses in excess over the value of that initial payment. Accordingly, the arguable reasonableness of Nationwide's denial of medical payments owing under the single-vehicle policy is a question on which reasonable minds could differ, and we thus hold that the district court erred in granting partial summary judgment on that issue.

### IV. *Conclusion.*

Based upon the foregoing, we REVERSE the judgment of the district court permitting stacking of medical payment coverages under the multi-vehicle policy and REMAND with instructions to deduct the amount improperly aggregated—$2,000—from the final award. We AFFIRM the district court's partial summary judgment holding that Nationwide's refusal both to pay uninsured motorist benefits, and to stack medical payment coverages under the multi-vehicle policy, did not constitute bad

---

**11.** We note that where Nationwide intended to prohibit stacking of identical coverages provided under more than one policy, this intent was clearly expressed. As to liability coverage, for example, the policy states that

> any occurrence to which this and any other automobile insurance policy issued to the Pol-

> icyholder by the Company also applies, the total limit of the Company's liability under all such policies shall not exceed the highest applicable limit of liability under one such policy....

faith. However, we REVERSE the district court's partial summary judgment holding that Nationwide's delay in paying medical payments under the single-vehicle policy did not amount to bad faith, and we REMAND this case for trial on that issue.